171657 Robert Lobel v. Woodland Golf Club of Auburndale Good morning, my name is Michael Longo, appearing on behalf of the appellant Robert Lobel. I'd like to request two minutes for Lobel, please. This is a case, respectfully, that must be overturned because a failure of this court to overturn the district court's judgment would be tied to an affirmation that discrimination against a disabled person is acceptable, where a private club regularly invites the public to use its facilities and makes substantial revenue from that non-member use. This is especially true here, where Woodland is seeking to comply with the ADA a la carte. Can I ask you first just to address the standing issue? Sure, on the issue of standing on it, I believe there is standing in the case because the fact that Mr. Chivinsky is no longer a member of the club doesn't preclude Mr. Lobel from signing up for one of the numerous public tournaments that the club has. But there's no allegation that he would, or that he has? He would, Your Honor. We have to go by the record, not what you say. Where in the record, it says that there are such tournaments, but there's nothing in the record that I can find that says he would, has any plans ever to sign up for any of them? Your Honor, the issue, obviously that issue came to a point, A, he says he wants to, and he has said he will. What is he saying he wants to? In his testimony, he said he tried to sign up for the Newton Chamber of Commerce. It was never asked of him one way or the other. That's your problem. You have the burden of showing standing. Correct, Your Honor. And you didn't have to show it at the time because you had a member who was representing he would go as a guest. That member quit, so he can't be his guest. Correct. So your only ground for saying that there's still a live case is that he would continue to go to charity tournaments, but nothing in the record says that. There's nothing in the record that says that, Your Honor. There's nothing in the record that indicates that he would not do that. But our precedent is pretty clear that the possibility that it could happen in a case like this isn't enough, at least as I read it. What authority suggests that when we don't know whether he would ever do it, they're standing? Your Honor, the fact that he knows, he's on notice that he cannot, and if you look at the Hamilton case, it talks about that. It says that as long as the person knows, he doesn't have to actively try to do it. I'm not saying he has to try, it's to tell us that he would like to. And he has said in his testimony that he wants to play at Woodland. At a charity tournament? At a charity tournament with a guest, he wants to play at Woodland. At a charity tournament? Yes, he tried to do that. Does he say there is a charity tournament he would like to be in again? There's charity tournaments every year, Your Honor. You're not answering my question. I think the answer is no, and then what you need to explain is because the answer is no, why is there still standing? There's still standing, Your Honor, because it was his intention to play with the member. It was his intention to play with the member at a charity event, or it was his intention to play through one of the charity events that they hold every year. Even absent there being a friend who's a member? He doesn't need to have a friend who's a member to play at a charity event. So his intention to play there is ongoing. He never says, he never said I wouldn't play unless I played with Jerry Trubinsky. He says I want to play at Woodland, and he can do that through a charity event, which they still hold. So if he says I want to play through a charity event, and I would have played through a charity event but for the fact that they wouldn't provide the cart, if they're still having charity events and he wants to play through a charity event, his standing continues. Even though there's no evidence at any time, either before or after, that he tried to, in the record, that he tried to play at a charity event? No, there is evidence in the record that he tried to play at a charity event. He tried to play during the Newton charity event, and when they made the inquiry through, this is when the Massachusetts Office of Disability got involved, and the Massachusetts Office of Disability instructed that Woodland should allow him to play in that event. Woodland's position was, we denied the Boys and Girls Club of America the ability to play through a charity event when someone needed this cart, and we're denying the request of the civil bill to use the cart during the charity event. So he did try specifically to play during that event, and he was denied. The thing is, it's a pretty different case if the case came to us only in the context of a particular charity event, because there might be an argument that Woodland would have to be open because the charity event has to be open. But as the case comes to us, the argument is that he gets to play at Woodland even when it's not a charity event, because he wanted to play as a guest of our member, and the only reason the charity event is mentioned is as evidence to refute the idea that it's a private club. Now you want us to reimagine the case in which it would be decided that the only thing that plausibly gives him any standing now is for some hypothetical charity event that he might be able to play in. It's just a pretty different case in which there's no record. We don't know what charity event that would be, whether that charity event would itself be a public accommodation, whether the private club exception would still apply then. So it just seems like such a different case than the one that you understandably were arguing before. But the argument at the lower court, the charity event was one of the issues in that case, that he tried to play through the charity event. But only for the purpose of trying to show that that meant Woodland, in all of its activities, was not a private club. But that's an irrelevancy now, because that part of the case is moot, because he has no standing to contend that he can play outside of a charity event. So your argument now is, the case is lodged because Woodland, insofar as it hosts a charity event, has to let him play in that charity event. That just seems like a relatively different issue than the one that's presented in the case. I would disagree in the sense that, again, and the Supreme Court says this in the PGA case, or actually in the Martin case at the district court level, you can't a la carte what things you're going to do that are and what things you aren't going to do that aren't ADA compliant. They can't say, well, I'm going to be ADA compliant today, but I'm not going to be ADA compliant tomorrow. But the PGA case is instructive. They didn't say that the club that hosted it had an obligation. They said the PGA, which was the tournament being hosted at the club. But that's a very different factual situation, and they don't hold it just because the PGA is at that club. The club, in all of its activities, now has to make those accommodations. But that wasn't the issue there. Exactly. But it is the issue here, because the application of what they were looking at in the PGA case was when you look at what a public accommodation is, it says the owner, operator, or lessee of a place. So in that case, the issue was they were the lessee. But in this case, they're the operator and owner. So the rationale of why the lessor had to comply would apply to the operator and owner of the facility. So you're looking at a different set, a different parameter of what the owner is versus the lessor. In this case, the owner is Woodland. So as the owner, they have to comply. The point is he might be able, in a case in which there was a terrible tournament hosted there, he might be able to play on Woodland through the same rationale as in the PGA case without ever us having to inquire whether Woodland is a private club or not. You might just have to decide whether the charitable entity that's leasing the club is a private club or not, just like the PGA. But even though that's the only thing live, is that speculative possibility, you want us to make a holding in this case that Woodland itself is a private club as the owner, even though there's no case live in which we would need to decide that issue. That's what I just am puzzled by. You're right. I think in that respect, the fact that Mr. Stravinsky, and I know he left, but he was basically forced to leave because of the way Woodland conducted itself. I think for this court to basically reward Woodland for making Mr. Stravinsky's life miserable and forcing him to basically leave the club so that they can now come after discovery is closed, and I can't even ask the question that Your Honor is posing is not on the record, to ask Mr. Robel, well, would you play with another member? Is there another member who would spot you? I think that with all due respect to Woodland, their tactics here were a little bit dilatory in that they probably were foaming at the mouth and salivating when the issue of Mr. Stravinsky being asked to leave as a member or a court requesting to leave because his life was so miserable there because they made it that way. I mean, to now reward them for that aspect of it when discovery is closed, I think, would be a very improper thing and would reward every other person in a case like this to do something to basically stop standing and do it in a way that they can now avoid liability for discriminating against somebody in the first place. I think the court has to consider that strongly and the fact that, you know, and you do have to look at when the complaint was drafted and was there standing at that time, and I understand the standing issue does have to continue. I'm not saying it does not, but I think it does in this case, A, because of the way the circumstances arrived and why potentially the standing issue on the one issue is gone, and I do think there's still standing on the issue of the charitable events and having to have those events be accessible to the public. I'm sort of curious about this. I know it's not in the record, but let's assume that ongoing events make it that Mr. Lobel isn't playing golf anymore. The case is still here. Is it still alive? It is, Your Honor, because, and I think this is when you get back to Hamill and you get back to the other standing issues that are expressed in that case, is that any other person, the person, for instance, who tried to apply to the Boys and Girls Club of America, the person who next year tries to apply who is not Mr. Lobel, this is an ongoing issue. There's immediate harm that could come of a person who is disabled and wants to play there during a charity event, or of the many, many golf members who are at the club. If they have a guest who wants to play, they don't have to, you know, it's actual notice, the standing issue. I have actual notice that I can't play there. So if Mr. Lobel were to find a member next week that says they're willing to basically go through the horribleness that Mr. Chavisky went through because of this issue, then it would be a live issue again. So it's not something that goes away. It is a live issue. It is something that's going to keep coming back, potentially. And it is something that if Mr. Lobel next year wants to play in a charitable tournament and applies and is denied, then we're back here again. It's an ongoing discrimination that they're doing, and only an injunction and declaratory relief would resolve that. So this is a lot broader than Mr. Lobel. You're really asking us to general principle that this club, if this issue comes up with someone else, they have an obligation to allow them to play using that particular card. And, Your Honor, it is. And I think, you know, Mr. Lobel is a public figure. Mr. Lobel's intentions in bringing this case were in large part because he deals with a lot of veterans and a lot of wounded warriors who want access to golf courses and want access to play using this card. And Mr. Lobel took it upon himself to bring this case, and he was affected. I mean, he did try to play there because he wanted to play there. I mean, he had played at Woodland in the past. He wanted to play there again with his friend, and he was denied access. And he brought this case in large part, A, because he wanted to play at Woodland, and B, for the numerous other people out there who were being denied, such as the person through the Boys and Girls Club that was denied, which Woodland admits. Actually, Judge Lynch, do you want to ask anything about the standing issue in particular? Yes, I do. Counsel, I'd like to refer you to two of our cases. In the Steer case, we found that the plaintiff's ADA claim was moot because she not only quit the Girl Scouts, but she renounced any intention of returning. Judge Lynch, unfortunately the audio is not so great in the room. If it's possible to speak louder, I'm actually able to hear it, so another possibility is if it just remains that way. I can just repeat the question if you don't mind. Okay. I believe two of our cases actually help your standing argument, so I just wanted to pursue them with you. One is the Steer case where we found it was moot because there was a repudiation of any desire to continue with the Girl Scouts. Their practices were at issue. I take it that there has been nothing in the record to indicate that LaBelle no longer wishes to play, even at charity events. Is that correct? That's correct, Your Honor, and again, that was my point, Judge Stahl. I'll get you away from it. Just for Judge Stahl's benefit, I'm going to repeat it, which I hope I get it. There was a lesson of ours of the Girl Scouts case in which we found it was moot because the Girl Scout plaintiff in that 88 case had renounced her intention to be in the Girl Scouts, and so the question to counsel is, is there any similar repudiation by the plaintiff here about an intention to play at Woodlawn, either as a guest or in a charitable event? No, that was my point earlier, that he never said he would not want to play there again. I mean, his testimony is that he wants to play there. Now, if events have occurred since he made that statement, I would express to the court, if that question could be posed to him at this point in time or if it's opposed to him at trial, his answer is going to be, yes, I still want to play there. I would play at a charitable event. I would play if a member invited me to play there. So his desire and his ability to play there should not have been stopped because of the ability of Woodlawn to basically buy him out, and they did buy him out. They basically gave him his entire initiation fee back, is my belief, or some portion of it. They gave it back to him as a way of buying him out of his membership. And the ability to basically buy that membership out and then come to this court and argue, well, there's no standing now, Judge, is, I think, a bit disingenuous. Judge Lynch, I don't want to... I do have a second case, please. We held in Disabled Americans for Equal Access that Title III ADA violations are sufficient to constitute injury in fact. And then we went on to say a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA and who is threatened with harm in the future because of existing or imminently threatened noncompliance with the ADA suffers actual or imminent harm and is sufficient to confer standing. And in that First Circuit case, we cite to a Ninth Circuit case. I take it your claim is that your basis for standing here is, in fact, the same as in the Disabled Americans case. It is, Your Honor. I think the reasoning that you just expressed in that case is the reasoning that's expressed in the Hamill case as well as even a case that deals with the other issues in this case as far as what is a private club in the Jenke case. It also says the same thing, where the harm is imminent, there need not be a continued asking to go. I mean, if you've asked and you know that the answer is no, you don't have to keep asking. And I think that's what that case holds. The difficulty that I have that maybe you can address, and it takes us to the merits of the private club exception, is that in the typical ADA public accommodations case, there is no conditional aspect to the access independent of the barrier that's being challenged. But here there is on your own view. In other words, you want Woodlawn to be treated not as a private club, even though you acknowledge no one can use it unless there is either this charitable event or you're invited as a guest by a member. So it's not like a store or something like that where I can just walk in. So if I walk in once and they bar me, I don't have to keep going through the humiliation of being rejected every time in order to maintain my standing. We've made that clear. But in this circumstance, the only entry point through is through the member. Well, when the member is gone, even if it's not a private club, you can't get in unless there's some other member. And it's not obvious that there would be another member absent some allegation. He was friends with this guy. I don't know whether he's got another friend in Woodlawn who's taken him. And then that just means the charitable event. So for me, that makes this case somewhat different than the typical case that we're dealing with. So could you address that aspect of it? Sure. I agree with you in the respect that that's what it is. But I think that the title of Article 3 contemplates that. And it says if a facility is private, then they have to do certain things. Now, with respect to, like you said, a store versus a club, it should not matter. And I think that's the overriding, when you look at the intention of the ADA, and when you look at the P.E.J. Torr case and all the language that they say of why it was drafted and the purpose of it, it was to make society more tolerant and more accepting of the disabled, to integrate the disabled into society and activities and sports. And that would include golf. And so, again, we're not saying, and I think this came up in my brief, and it came up in one of the decisions over with Judge Sailor, we're not saying that because they have to follow the ADA, they are now a public course that has to open up its doors to everybody who is a member of the public. The people who want to use that course still have to go through exactly what your Honor said. They have to know a member, or they have to be going through a tournament, they have to be invited to a wedding, they have to get into the club in some manner. But once they get there, if the club is allowing that to occur, if they're allowing people who are non-members to come into the club and use the facilities, the club has to be ADA compliant. And this club, in large part, is. They've done a great job of putting handicapped ramps, handicapped parking. The pro shop is handicapped accessible. There's wheelchair access to get behind the bar. The pool has three of the handicapped lifts so that people can go in and out. So they have done, to their credit, a very nice job of being ADA compliant. But in this case, they're saying, gee, our precious golf course might get ruined because someone drives on it with a specialized car. So we're going to say, no, we don't have to follow the ADA. And the PGA case in the district court says you can't a la carte it. You can't hopscotch it. You can't have zones here and zones there. If you're going to be ADA compliant and you're going to be inviting the public, then you have to be in or you're out. But so what's the argument that they're inviting the public in, given the selective criteria that they do have? They're inviting the public in because members of the public are coming into the club. They're coming in under very, very restricted circumstances. All the weddings were club members. They weren't public in the sense that they weren't out selling the facility for non-club members. Club members were having weddings there. So there was always a private club aspect to this. It seems to me that unless you get by your first issue, the private club is pretty clear. It is a private club. But once you open your doors, once you have charitable events, once you have other events, once you advertise on the web, I mean, I know I'm out of time, but there's eight criteria that Minds Now looks at. And when you look at each of those aspects, the things they do here are distinguishable from the cases that are cited there. Maybe you could help me. What is a private club? What falls within a private club if this does not? Well, again, I think, in what sense, Your Honor? There's a statute. It's got a thing. It says private clubs are exempt. So they had something in mind. You're saying a private golf club was not what they had in mind when it has selective membership criteria, you have to pay a price, you have to be interested in golf, you have to be civically minded, whatever they, all the different things they said. You say that's not a private club. What would be? A private club is a club, I mean, there's some drastic examples of it, but if they said, you know, we're not going to let anyone come in, we're not going to host. No one can come in. That would be a bad club. It would be a bad club. So what's a club that's open to people coming in that's still private? An example of what? If Wilton just said, I'm not going to hold charitable events, I'm not going to open our doors to weddings, I'm not going to advertise on the web, I'm not going to have a pro shop with a yellow page ad that says you can come in and pay caps to buy things, I'm not going to have a Facebook page, a web book page that has a membership drop-down. The pro shop is open to the public generally? I don't think so. People can pay cash at the pro shop. So in other words, a non-member can go and buy things at the pro shop. I don't know, and I don't want to misspeak, the record isn't clear that someone can drive onto the facility and use it. I don't know if that's the case or not, but there is a yellow page ad that says there is a pro shop and that people can pay cash to purchase things at the pro shop. In other words, they don't need to use, you know, member cards to basically say put it on my account. You can pay cash at the pro shop to purchase things. Just like you can pay cash at the tournaments to buy food. So they are generating revenue through all these different things, of people paying cash. And again, when you look at each individual element and look at the case law, you know, there are certain cases like the Chicago club is one of the cases that was relied upon heavily by the district court. Can I change the hypothetical a little? Let's assume the only events where non-club members were there would be an event where a club member would have a wedding. And there were obviously non-club members invited to the wedding. No other events at all, no charitable events, would that still be a private club or would that be a public club in your formulation? I think that's a tougher situation. I think in that case, if they don't have the charitable events and it's just the weddings, I would still say if members of the public are coming in, then they have to comply. So in other words, there is no true private club exemption in the statute unless it is, as Judge Barron said, so private that no one, it's sort of like a secret society, no one else could be there except people who are club members. I think that's how, when you look at the case law and you look at the intention of the ADA, I think that, and I know it says a private club exemption, and again, I'm not trying to say they're not a private club. They are a private club, but they have to follow the ADA. And I understand the exemption says if you are a private club, you don't have to follow the ADA. And so it's a slippery slope. I'll admit that, Your Honor. But if you were inviting the public in, and it is not just your little club that you have, that you meet with and do things with, and I understand you have some use, maybe with one or two weddings a year, maybe that would not qualify. But even weddings would probably... But if you get to four or five, six charity events, rehearsal dinners... But what about a guest? Does one member bring a guest? I don't think that would... Why not? Because I think that's a little bit different. That's a member bringing a guest, and the member in that situation... But what's a wedding? There's just a lot of guests. Well, it's different, Your Honor, in the sense that one member can choose... In a wedding year, yes, you have a guest list, and you're inviting certain people. But I think bringing the guest is a little bit different, because you want to be able to promote at least bringing one guest to the facility, and you can discriminate against which guest you want to invite. If you know the course doesn't allow disabled golfers to golf, you could not invite that guest. If you're inviting all the parents... It's just associated with small weddings and big weddings. Well, but if you're inviting... Let's go with the wedding example. If I have a wedding, and I want to invite Uncle Harry, and Uncle Harry is disabled and uses a wheelchair, if Woodland wasn't ADA compliant, and again, they are in every other aspect, if Uncle Harry couldn't get into the building because there was no curb cut, if Uncle Harry couldn't park in a handicapped spot, if Uncle Harry couldn't use the bathroom because of things, I think everyone would be up in arms. But that's not the case here. They've chosen to be ADA compliant on every other level. Judge Lynch, I just want to give you a chance for any last question before we move on. I have two questions, please. Yes. The first is back to the question of standing or movement. Judge Barron characterized your position as having to come in through a member. I had understood that your client had made three attempts to be on the golf course in this special wheelchair arrangement, and that one of those, each time he was declined, and that one of those was a charity golf tournament open to the public. And I had understood your claim as not necessarily excluding an invitation from another guest, but as focused more on the public golf tournament and your client's at least failure to repudiate the notion that your client had not repudiated the desire to participate in those tournaments. Is that correct? Yes, Your Honor. Okay. Secondly, it appears to me that as to the club issue, which has been the subject of questioning over the last five minutes, I'm wondering if you have narrowed your claim to say that as to public golf tournaments, only for that is the club a private club, but at that point it becomes a public club. There's been a lot of talk about marriage, but I'm not sure what that has to do with your claim. So I'm trying to understand if you've narrowed your claim to the public golf tournaments, and if not, what is your claim? Your Honor, I don't know that I've narrowed it. I mean, I would certainly express to the court that I 100 percent believe that during the public tournaments that you can sign up for online and anyone can do,  then yes, they have to comply with the ADA during those tournaments. I wouldn't limit my scope or limit my claim to that. I feel that once the door has been opened and once you have to be ADA compliant, again, it's not a la carte. You can't choose, I'm going to be ADA compliant here but not ADA compliant there. So once they make the decision to open themselves up and have those public tournaments, then they have to be ADA compliant across the board. But I do think that is the vehicle by which we get to that position. I don't understand why you would have standing as to marriage ceremonies. I thought that was not at issue in this case. I don't understand your notion that you can be a sort of broad public plaintiff as though you were the Attorney General. Well, I'm certainly not trying to be the Attorney General, Your Honor. I just think that in looking at the ADA, again, I don't want to belabor the point, but if you're ADA compliant, you're ADA compliant. If the exception doesn't apply, and I do appreciate the fact that there is, I guess, a carve-out here where you could say, as Judge Barrett indicated, that it's during the tournaments that they have to be ADA compliant. I could see that argument, and I respect that argument. But I do think that if you look at the case law in the Lansdow case and looking at the totality of it, if you are looking at the different aspects of things, if they are not a private club or if they do things that lend themselves not to be private in one area, then that does open them up to have to follow the ADA. And that's really what we're trying to say here is that they have to follow the ADA. If they open the doors and they are benefiting from the public use of the course, then they have to be ADA compliant. They don't have to let the public in. They don't have to make the course open to the public that anyone can go play golf there any day of the week without a member. That's not what we're saying. What we're saying is they have to be ADA compliant. Thank you. Unless you have any follow-up, we'll move to the next counsel. Thank you. No more questions. Thank you. May it please the Court, my name is Don Schroeder. I'm here on behalf of Wootwood Golf Club. And if I can crystallize what this case is and is not, I think Judge Barron mentioned up front that it's not your typical Title III public accommodations case. In fact, it's not your typical garden variety summary judgment case. This is a single claim, Title III, under the ADA, which is seeking forward-looking equitable relief. There's no right to a jury trial. It is purely one claim, and it's really looking for forward equitable relief. It's our contention, Wootwood's contention, that because it falls within the statutory private club exemption, it's not covered by the ADA altogether. And based on an extensive record that supports that Wootwood falls squarely within that definition, we ask the Court to affirm the award of summary judgment in Wootwood's favor. But don't we have to decide standing first? Yes, Your Honor. After that background, I was going to go to that issue right away since that seemed to be on the Court's mind. The issue, obviously, for Article III standing is plaintiff must have suffered an injury in fact. Injury must be fairly traceable to the challenge action of the defendant, and it must be likely, not merely speculative, that the injury will be addressed by a favorable decision. Now, what do we know is in the actual record in this case as opposed to things that have been suggested outside of the record? The only thing we know is that Mr. Stravinsky is no longer a member of the club, and that that is very recent. He left voluntarily in summer of 2017. It's undisputed. Here are a number of other undisputed facts. Can I just, before you move on to this, do we know why he left? No. The record is silent. Everything we've heard about why he left is not in the record. I did want to address that, Judge Barron. There's nothing in the record about him other than voluntarily leaving and nothing otherwise. What we do know is in the record is the fact that Lobel has never been a member of Woodland. In fact, the only time he's played there, he's never golfed or sought to golf at Woodland without Jerry Stravinsky. There's no question in the record that they were good friends and that Jerry Stravinsky over the years was his conduit to play at Woodland. Mr. Lobel, and this is all in the record in Appendix Exhibits version 176-89. In addition, Mr. Lobel has never spoken with anyone at Woodland about using his solo rider on the greens or bunkers. And that's an important point because I think there was a suggestion that Woodland denied Mr. Lobel the opportunity to actually play golf at Woodland. And that's not the case. Woodland allowed and invited Mr. Lobel, through Mr. Stravinsky, to play golf at Woodland, except not to be able to use his solo riders on the bunkers and greens. So it's not going very well to the standing point. It's not. I'm just going back to... Just stick to the standing right now. With respect to the standing point, all communications with Woodland came through Mr. Stravinsky, and at some times without Mr. Lobel's knowledge. Mr. Stravinsky conceived of and drove this litigation because he wanted, quote, Bob to be able to play golf with him at Woodland. And in fact, he was the one that was the driving force behind the charitable event involving the Newton-Yeaton Chamber of Commerce. That is all in the record. That this was Mr. Stravinsky's idea, and this was his... Is there testimony from Lobel about his desire to play other charitable events at Woodland? There is no other testimony regarding any other charitable events at Woodland. This charitable event, I believe, was in the fall of 2014. Can he testify that he wanted to play at that charitable event? That he was seeking to play at that charitable event through Mr. Stravinsky's efforts... Is there anything in the record showing whether that charitable event would be held again? I know it's been held on one or other occasions. There's nothing in the record showing that it will be held again in the future? No. No, Your Honor. Is there anything in the record showing anything about other charitable events that will be held in the future? No, Your Honor. I don't believe so. In fact, there is no reason to believe that Mr. Lobel would want to golf at Woodland ever again. This goes to the issue of the Steer case that was mentioned by Judge Lynch. Obviously, holding that the Title 3 ADA case against the Girl Scouts was moot... because nothing in the complaint indicated that the plaintiff had any desire to resume her scouting career. There is no prospective relief of a personal nature that the district court could award. And that's the case here, Your Honors. There is nothing in the record that suggests that Mr. Lobel has any plan to golf in any specific tournament, public charity, or any other charitable event... or that he has another member that would have brought him on to the course. It was always Mr. Stravinsky, and as the record is replete with this evidence, this was Mr. Stravinsky's idea all along. In response to my question, Judge Lynch asked, am I right in understanding the claim here to be a claim that he, Mr. Lobel... would have a right under the ADA to play at Woodlawn through the auspices of a member... even apart from there being a charitable event that he wanted to play in? In other words, that the actual claim that was presented to the district court was seeking a right to play at Woodlawn... independent of charity events, so long as a member would take him as a guest. Correct, Your Honor. It was multifaceted as far as the ability to play at Woodlawn. So the actual claim that's being appealed, the judgment on the claim that's being appealed from... not just can he play at Woodlawn in a charitable event, but also can he play at Woodlawn with a member? Correct. But there's nothing in the record to indicate that there is any member with whom he desires to play or who he desires to invite him to play there. Correct, Your Honor. So in that respect, all that's left in the case, arguably, is whether he could still play at Woodlawn in a charitable event. Correct. But there's nothing in the record to indicate what that charitable event might be, what its parameters would be, whether he could actually play there by just suing the charitable event as the lessor, the lessee, and getting in through that mechanism, what the parameters of that charitable event would be, how open it would be, etc. Correct, Your Honor. It's purely hypothetical and speculative, and to your point about that that goes to the PGA Tour versus Casey Martin. So let me ask, if this was right and we concluded that there is no standing and the case was moot, that would suggest to me that we should vacate the judgment below. Well, I think that whether or not there's standing right now, the other issue is whether or not there is the Title III exemption. If we don't get to that, if there's no standing right now, it would moot the case. And under Munsingwear, as I understand it, the reason that it would be moot is because some unforeseen development outside the party's control happened that mooted the case, which means I think traditionally we would then vacate the judgment below. So you just start from square one. If he can find someone to bring the suit, he can, but there's no reason to keep the district court judgment in place if he couldn't get an effective appeal because it mooted out for reasons beyond his control. Well, even if there is no standing currently for Mr. Lobel, the case recites the factors of what is a private club exemption, and it's instructive in that regard. It's great to have read, but in terms of a judgment that's binding under Munsingwear, I thought when the case moots out, we ordinarily would vacate the judgment below because there was no opportunity to do a proper appeal because it mooted out. And it wasn't because of any unilateral action by any party. It's just circumstances happened. So then we would vacate the judgment below. What's your view on that? I would suggest, Your Honor, that I wouldn't vacate the judgment below. I'm sure you wouldn't want to, but I guess in terms of what would be the reason why we wouldn't do that. Well, I think given the fact that at the time there was standing, I understand that there's no standing now. At the time there was standing, Mr. Stravinsky was a member of the club at the time, relevant time, during the complaint. He may not be now, but certainly during the relevant time when that case was decided in the lower court level. That's true of all cases that moot out. Well, understood. So that can't be the reason since we often vacate things that moot out. I think given whether or not the court entertains the standing argument and rules in its favor, the court obviously has at its discretion the ability to vacate the award at the lower level. And I would obviously be in favor of keeping the award at the lower level for the reasons stated, but I understand the court's processes in that regard. If I may, I turn just to the private club exemption. Before you do just that, I might, I don't know, to Saul, do you have anything on the standing issue you'd like to ask? Yes, please. As I understood the facts of record in this case, in the summer of 2014, after the member had made the private request and it had been turned down, that the Newton Chamber of Commerce, which was hosting an event open to the public, submitted an accommodation request after Lobel asked them to. That was denied on the basis that the solo rider would match the green. After those three denials, the member informed Woodland that Lobel could demonstrate how he used the solo rider in order to allay Woodland's concerns. The club turned him down. But then after that, probably in late September, after the three denials, Cheburinsky was informed that Lobel could use the solo rider on the greens one time. If both the member and the guest, Lobel, signed a letter stating that Lobel would never play there again afterwards and that the guest refused to guarantee that Lobel would never play afterwards. So the club certainly viewed the controversy as continuing. There is a multiple because it came up with a solution which was rejected. Judge Wentzoff, unfortunately the audio here is not great. The very last part of your question dropped out. All right. That the club viewed the controversy as continuing after the three denials when it made what looked like a settlement offer that he could use this device one time if he would guarantee Lobel would never play there again. I'm asking if that's an accurate rendition of this record. That came through rather clear to me. Your Honor, Judge Lynch, I would say that there was a continuing discussion into the fall of 2014 in the record regarding circumstances under which Mr. Lobel might be able to use the golf cart at Woodland. I will tell you, and nothing that you've recited is contradicted in the record. In fact, it is there. However, the one additional point is there was no communications by Mr. Cheburinsky or Mr. Lobel at any point following September 2014 until the filing of this complaint in November of 2015. And when does the member quit? This past summer, July of 2017. So at the time of all those discussions, the member was still a member? Correct, Your Honor. In light of the fact that I've got a minute and 20 left, I'm going to... We'll let you go over this and we'll cut to other counsel. I'm sort of curious about this. Oh, I'm sorry. Judge Lynch, did you have another question? I do. Are you saying that the record shows that after the fall of 2014, the club held no charitable golf events open to the public? No, I didn't say that, Your Honor. I don't recall that being in the record as to after that event whether or not there is... I know that we do have fiscal 2014 and fiscal 2015 data in the record. I don't recall when those charitable events happened and whether or not in 2015 there was an event later than the Newton Needham Chamber of Commerce event. My only point was that there was a huge break in communications between the parties from the time of September 14 to the filing of the complaint in November of 15. I take it that the plaintiff, Mr. Lodell, has argued that the club regularly, at least on an annual basis, has opened up its premises to the public for these charitable golf events. Are you saying there is no such record and that there were no such annual events? No, Your Honor. Just the contrary, actually. In 2014 and 2015, the record is replete with evidence and it's in the Garfinkel supplemental affidavits with respect to the fact that there were 16 outside events, golf events in fiscal 2014, which were all sponsored by at least one Woodland member and all for a non-profit religious organization or organized to benefit charity. In 2015, there were 13 outside golf events that were all sponsored by a member and all for a non-profit or religious organization or organized to benefit charity. As referred to by Judge Stahl, there were five weddings between 2014 and 2015. They were all sponsored by a member for somebody in the member's family. Out of those 29 events, 23 of them happened to occur on days when the course is generally closed to members of the golf community at Woodland. 23 out of 29. They were held on Monday afternoons when the course is closed for that day for it to recover from weekend play. So out of the whole time period, there's 245 days of golfing on any given year depending upon the weather in New England and then about 35 days of that on Mondays or Tuesdays following Monday holiday. Thank you very much. Could you just explain, what is the claim as you understand it? What was the relief that he saw? An injunction saying what? The relief that he saw was in order to be able to use the solo rider, his special golf cart. Well, a couple of things. There's some things that weren't even asked for, but were asked for in this litigation. Initially, it was my understanding and the club's understanding that he was seeking to use the solo rider on every single hole from tee to hole and use it in the bunkers as well as the greens, setting aside their view that the bunkers would be unsafe and that the greens would be damaged. That was what... Wait a minute. When? Because we want an injunction saying, I'd like to be able to do that when he was brought on the course with Mr. Chervinsky. Does it say, and I'd like to also be able to do that? Was he seeking an injunction that said, and I'd also like to be able to do that even when I'm not brought on the course by that number in a charitable event? I don't think it's entirely clear from the record that that was the relief sought. That's what I'm trying to ask. There's two different things going on here. One is, the relief he wants is to be able to go on to the Woodlawn Golf Course in any circumstance in which he can get on to the Woodlawn Golf Course through the rules of the Woodlawn Golf Course, which would be with a member, when there's a tournament, and that might mean part of the case is still alive, as long as there's still a tournament. Another possibility is, he wanted to go in with a member, and the evidence of the charitable tournaments is just in the case to prove it's not a private club. Do you see the difference between those two? I'm just trying to figure out, what is the... Well, I defer to Pat's question. You make an argument to us that there's no standing, and it depends in part on what the claim is, I think. I think it's unclear that this is about an ability to go into charitable events. There's evidence that they tried to go into one charitable event in September of 2014. The driving force behind the complaint, all discovery, the entire record in this case before this court, it relates to Mr. Trevinsky and his ability to play with his friend on the course through his membership. That's been the driving force. Now, with respect to, if I may, Your Honor, just address the Title III exemption under the law, because as Judge Barron, as you mentioned, this case is different than the PGA Tours versus Casey Martin case, because the PGA Tours was an event, kind of a rambling circus. It goes here, there, and everywhere. It's not what is in this case, which is this case is against Woodland Golf Club, and whether or not the private club exemption exists. Now, there's eight factors, and I'll be very brief. There's eight factors. Four of them were conceded from the outset. History, purpose, nonprofit status, and formalities. Those are conceded by the plaintiff, and that was on the record before Judge Saylor. So four out of eight are already in the Woodland column. At the end of the day, Judge Saylor ruled that all eight factors were in Woodland's favor, and eight are ruling. And what you get at when you go through the remaining four factors, which are addressed ad nauseam in all of our papers, including Judge Saylor's decision, what you determine is each factor is undisputed that Woodland meets those criteria, whether it's genuine selectivity, whether it's membership control over operations, limited use by non-members. We've gone through all of the data on how many charitable events have happened, how many weddings for the two years prior, as well as... How are we supposed to think about limited use for non-members? You're talking about 20 charitable events a year? It was 16 in one year and 13 in another. And how many people participate in one of these charitable events that are not members? It could be upwards of 70 to 100. And how many people are invited to participate in those charitable events? In other words, there's... I have no idea, Your Honor. Is there anybody who wants to play golf in Massachusetts? No, I think it would be geared towards... So, for instance, a number of them are religious charitable organizations, and however they advertise to their membership... But as far as you know, they advertise by saying, anybody who wants to play and wants to donate to us, we're happy to have you. Well, there's nothing in the record to suggest how any of those events are communicated to the public. This case, though, like the Janki case, which had 38 events over a couple of years... More than once a month, they're opening the course, potentially, to a really, really broad aspect of the public. However, Your Honor, when you're doing that, it is not in any way impacting... First of all, it's guide and member-sponsored, so you just can't decide, I want to hold an event at Woodland, and just go up there and say, I'm going to hold an event, and I'll pay whatever it is. But this is the club saying, we're happy once a month to have anybody in the public come on to our course. Well, it's geared towards religious non-profit organizations that they have traditionally had a relationship with, because the member has had a relationship with them. And so that's what's geared those events. There's 16 in one year, 13 in another. Janki, the Janki case, had 38 events over the course of several years. What kind of events were those? They were in a commissary. Open to the public events. It was in the commissary at 20th Century Fox television studios. What the standard is, though, Your Honor, is that it is regular and indiscriminate use by members of the public. And when these events occur, were on days when the club wasn't generally open, on a Monday afternoon, or on the Tuesday following a holiday. So they're very restricted on when those events can happen. It's not a given that every single year you're going to have the same number of events. It will depend upon, in part, the general manager, as well as the leadership of the board of directors, to determine whether or not they have enough time, based upon weather, among other reasons, to do that. In the end, all four of the additional factors weigh heavily in favor of Woodland. Specifically, one thing that I think was brought up in the papers that deserves a quick mention, is the issue of whether there's this line of cases on EEOC Title VII line of cases, and whether or not they have any bearing on the ADA line of cases. In fact, the four factors that the EEOC relies upon are the four factors that we're discussing here today, access by non-members, membership control, advertising, and genuine selectivity. And so I submit that those cases are obviously persuasive in that regard. Yes, you just affirmed me to say that. I'd like to go back to the question I wanted to ask about ten minutes ago. In the typical ADA case, it's a barrier case, typically. You don't have an ability to navigate because the doors are too narrow, there's steps that are too steep, there's no ramp, etc. This is an atypical ADA case. This is somebody who says that because of my peculiar characteristics, I have to use a particular device to access your premises. I assume your reason for not allowing that is that the typical device could cause damage to the premises. And this is probably a better question for your brother over here. But are we saying if we agree to his premise that if my device causes damage, that's too bad because the ADA says that that's the only way I can do this. I can go ahead and do it. I think a couple things, Your Honor. Certainly from the standpoint of what this case is about and the fact that it's not your typical ADA case, it really is focused on the private club exemption. If we're a private club, there's no middle ground there. It's an all or nothing proposition here. We are a private club exempt under the ADA, so we get to determine under what conditions we may or may not want something to happen. The court never addressed or got to the prima facie case of whether or not, and there's no dispute that he was disabled, but the question is, are you disabled? Is it a public accommodation? So it's your position that really we should decide the private club issue first because if we decide the private club issue, then the standing issue in a sense goes away because we have determined how our club is to be used. Right, it goes to the issue of applicability of a statutory exemption. And that is what was Judge Saylor's reasoning at the lower court that he didn't even get to the prima facie case of whether or not there's disability discrimination because you don't need to go there because there's a procedural issue as to whether or not the statutory exemption for private clubs exists. Just to clarify, you think that we should do the private club before the prima facie case, but the standing issue is part of all of that? Correct, yeah. Judge Lynch, did you have anything further? Yes, I have two questions again about the record. It was my understanding that either 2014 or 2015, that one of the charitable golf events, at least one, was sponsored by a non-religious organization, the Newton Wellesley Chamber of Commerce. You seem to suggest that these requests or charitable events were sponsored by religious organizations, but is that actually what the record shows? Well, Your Honor, it shows what I think I hopefully said, which is that it was a series of non-profit religious organizations, charitable organizations. So not just religious organizations. All right. The second, Jim, is that I understood from the record that a non-profit organization could make a request directly to your board for permission to hold such an event. You keep stressing that they all had member sponsorship, but I understood there was an avenue available that did not require member sponsorship. Is that correct? No, Your Honor. The event would have to be sponsored by a member, and it would come through the general manager, who at the time was David Garfinkel. A request would be made, but it would need to be sponsored by a member. Okay. So the Newton Wellesley event, to use an example, was sponsored by a member? I believe so, Your Honor. Yes. Does the record say anything about what that means? I mean, obviously the club would have to approve the event for the event to happen. So if a charitable organization can call up Woodlawn and say, I'd like to do a charitable event at your club, the club's going to have to approve it. So when you say that a member sponsors it, what does that mean? Does the record say anything about that? Well, the member is responsible for making sure. Actually, it does. There's three Garfinkel affidavits on this subject, as well as Garfinkel's deposition testimony. There certainly is a number of rules relating to whether or not the member is on the, quote-unquote, So because traditionally, historically, the events have this connection with the member, where the member wants to have an event there, like St. Sebastian's. There's a member that has that relationship. He wants to have that event there. The member has certain duties to ensure that the bills are paid. So that's the connection. I perhaps didn't clarify that early on.  There's no prohibition against any charitable event ever being at the club, so long as some member is willing to take on that role of organizing it. Right. Yeah. Thank you. Thank you, Your Honors. Thank you. Did you reserve two minutes? Yes. Okay. Take a minute and then just wrap it up. I just wanted to, one of the things that came up were tournaments. In the record, it's 277 through 314 of Volume 2. There's tournaments in 2016 that are in the record. There's tournaments that talk about, it's not even a charitable event. It's the Amulet Tournament, which may, I might be misspeaking, could have been for a charity. But that's an event where they serve food for cash, where anyone can sign up for it, where spectators can come and watch, can use the facility. Getting back to Your Honor's point, the charity events, and you can look at the record again, it's online sign-up. Anyone, anyone from anywhere around the world can sign up to play at Woodland through a charity event. Thank you very much. Thank you, Your Honor. All rise.